**NOT FOR PUBLICATION**


UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY


- - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:

SOLOMON DWEK

     Debtor                                   Chapter 11
                                            Case No.07-11757


- - - - - - - - - - - - - - - - - - - - - - - - - - -X

JOSEPH DWEK and TERRY DWEK

     Plaintiffs,

          vs.                            Lead Adversary No. 07-1616
                                        Consolidated Adv. No. 07-1697

SUN NATIONAL BANK and
SOLOMON DWEK

     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

SUN NATIONAL BANK,

     Third-Party Plaintiff,

          vs.                           **MEMORANDUM OPINION**
                                        Trial Dates:   10/27/09, 12/15/09,

AMY ANNECHARICO,                                    1/26/10

     Third-Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

## APPEARANCES

James Kim, Esquire
Damon Kamvosoulis, Esquire
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD
25 Main Street
Hackensack, New Jersey 07601
Attorneys for Plaintiffs, Joseph and Terry Dwek


Joseph Blum, Esquire
Colin Kinsley, Esquire
DEEB, PETRAKIS, BLUM & MURPHY, P.C.
1601 Market Street
Philadelphia, Pennsylvania 19103
Attorneys for Defendant/Counterclaim Plaintiff, Sun National Bank


Timothy P. Neumann, Esquire
BROEGE, NEUMANN, FISCHER & SHAVER
25 Abe Voorhees Drive
Manasquan, New Jersey 08736
Attorney for Defendant, Solomon Dwek

Procedural History

In September 2006, Joseph and Terry Dwek filed a complaint against Sun National Bank and Solomon Dwek in the Superior Court of New Jersey, Chancery Division ("State Court action"). Defendant Sun National Bank ("Sun") filed a counterclaim, cross-claim, and third-party complaint in the State Court action. Sun removed the State Court action to the United States District Court for the District of New Jersey, and the District Court referred it to the Bankruptcy Court on April 27, 2007. Thereafter, Sun filed a complaint in the Bankruptcy Court seeking a determination that to the extent the Debtor is found liable for any damages to Sun in the State Court action, that obligation would be deemed non-dischargeable in Solomon Dwek's bankruptcy case [Adv. Pro. 07-1697]. Sun's non-dischargeability adversary complaint was consolidated with the State Court action by stipulation dated October 11, 2007.

The Bankruptcy Court tried this matter on several non-sequential days commencing October 27, 2009 and concluding on January 26, 2010. The parties filed their post-trial submissions on March 3, 2010. The Bankruptcy Court makes the following proposed findings of fact and conclusions of law in accordance with 28 U.S.C. § 157(c).

Factual Background

Joseph and Terry Dwek jointly own 234 Runyan Avenue, Deal, New Jersey. Solomon Dwek is the nephew of Joseph and Terry Dwek. Sun National Bank is the successor in interest of Community Bank of New Jersey ("Bank"). Joseph Dwek and Solomon Dwek were active business partners, and from 2000-06 they engaged in numerous real estate transactions together.

At the heart of this proceeding is a $1,500,000 loan made by Community Bank on December 13, 2001 in favor of Joseph and Terry Dwek. The loan was secured by a mortgage on the property

at 234 Runyan Avenue. The mortgage was recorded on December 21, 2001, in the Monmouth

County Clerk's Office. The signatures on the mortgage were notarized by Amy Annecharico. Ms.

Annecharico worked as Solomon Dwek's secretary.

In March 2005, Joseph contacted the Bank and asked for information regarding a loan that

appeared on his personal credit report. The Bank's representative, Cheryle Hale, informed Joseph

that the loan was secured by a mortgage on his residence. Joseph testified that he told Ms. Hale that

the loan was not his and requested documentation regarding the loan. The Bank immediately faxed

him the requested documentation, as well as additional documentation in April 2005. From April

2005 until May 2006 regular payments continued to be made on the loan. No payment on the loan

has been made since the May 2006 payment  The next communication Joseph Dwek had with the

Bank regarding the loan was in June 2006 when his attorney sent a letter to the Bank disputing the

mortgage.

Discussion

A. Forgery

The Dweks maintain that the subject loan must be declared invalid because the signatures

of Joseph and Terry Dwek on the note and mortgage were forged. New Jersey law provides that "[a]

person is not liable on an instrument unless the person signed the instrument, or the person is

represented by an agent or representative who signed the instrument and the signature is binding on

the represented person." *N.J.S.A.* 12A:3-401(a). The definition of an "unauthorized" signature

includes a forgery. *N.J.S.A.* 12A:1-201(43). Once there has been an allegation in the pleadings that

the signature on an instrument is a forgery, "the burden of establishing validity is on the person

claiming validity". *N.J.S.A.* 12A3:-308(a). So in this case, it is the Bank's burden to prove that the signatures of the Dweks were valid.

      1) Terry Dwek

      It was clearly established at trial that Terry Dwek did not sign the note and mortgage. Solomon Dwek testified that he signed Terry Dwek's name to all of the loan documents. *Trial Transcript (Dec 15, 2009)* 47:4-49:22-25. The Bank's handwriting expert also stated in her report that the signatures of Terry Dwek were not genuine. Nonetheless, Terry Dwek can still be held liable on those instruments if Solomon Dwek was authorized to sign on her behalf. *N.J.S.A.* 12A:3-401(a).

      At trial, Solomon Dwek testified that he had authority to execute documents on Terry's behalf under a written power of attorney, which Solomon claims was prepared and maintained by Michael Benedetto, Esq. *Trial Transcript (Dec. 15, 2009)* 48:1-2; 49:7-12. At trial, Mr. Benedetto testified that he did not prepare a power of attorney on behalf of Terry Dwek and has never seen one. *Trial Transcript (Jan. 26, 2010)* 102:13-21. Solomon Dwek testified that he signed Terry Dwek's name to the loan documents in the presence of Todd Holmes, the Bank's loan officer. If that is to be believed, it would stand to reason that a copy of the power of attorney would be part of the Bank's file regarding the closing, but neither an original nor a copy of the alleged power of attorney was submitted as evidence. Terry Dwek testified unequivocally that she never executed a written power of attorney in favor of Solomon Dwek and never authorized him to act on her behalf. *Trial Transcript (Oct. 27, 2009)* 26:20-25. The confluence of this evidence compels the conclusion that Solomon Dwek did not have oral or written authority from Terry Dwek to sign her name to the loan

documents.  The Bank has failed to meet its burden of proving the validity of Terry Dwek's

signature.

      2) Joseph Dwek

      At trial, the Bank presented the testimony of J. Wright Leonard who was qualified as an

expert in handwriting analysis.  Among other qualifications, Ms. Leonard is board certified by the

National Association of Document Examiners and the American Board of Forensic Examiners [Ex.

D50].  The Dweks did not present any expert testimony in rebuttal.  Ms. Leonard concluded that the

signature on the Mortgage was that of Joseph Dwek. [Ex. D51; D52].

      The mortgage is the only document the Bank contends was signed by Joseph Dwek.  It is the

Bank's position that Joseph authorized Solomon to sign his name on the other loan documents.

Under Solomon's version of the facts, the genesis of the loan was that the Deal Yeshiva was

experiencing a cash flow problem so Solomon approached his Uncle about borrowing money from

him on a short-term basis.  Solomon contends that at first Joseph was reluctant to put a mortgage on

his property at 234 Runyan Avenue, but capitulated based on Solomon's assurances that it would be

for only thirty to sixty days.  *Trial Transcript (Dec. 15, 2009)* 23:5-11.  Solomon contends that there

was a telephone conference call between Solomon, Joseph, and Todd Holmes regarding the loan and

that later that afternoon Solomon brought the mortgage to Joseph's office in New York where Joseph

signed it.  *Trial Transcript (Dec. 15, 2009)* 24:1-18.  Solomon stated that he did not bring the other

loan documents because Todd Holmes had not prepared them yet.

      The Plaintiffs understandably want the Court to discredit Solomon's testimony because he

has plead guilty to fraud and money laundering.  In addition, he has admitted to lying to Joseph on

certain occasions.  In this instance, however, Solomon's testimony is the most logically consistent

with the other facts in the record.  The record is replete with evidence that Joseph allowed Solomon

to act on his behalf in numerous business transaction.  For example, Solomon signed Joseph's name

to loan documents on a $816,000 loan for the Goodyear Windsor project just six months before the

loan at issue in this case[1]. [Ex. D113-118; *Trial Transcript* (*Jan. 26, 2010*) 13:22 - 17:25.].  When

Joseph was directly questioned about whether the signature that appeared on the mortgage was his,

he did not unequivocally deny it.  Rather, Joseph stated that it looked like his signature but since he

did not recall signing the mortgage "it's a mystery how my signature is on this paper."  *Trial

Transcript (Oct. 27, 2009)* 54:19-23.  Joseph's equivocation regarding his signature, combined with

the testimony of Solomon and the handwriting expert, compel the conclusion that Joseph Dwek

himself signed the mortgage.

The next question is whether Joseph authorized Solomon to sign the remainder of the loan

documents.  Again, the answer is yes.  First, it would be nonsensical for Joseph to agree to mortgage

his property (a form of security) but not agree to the underlying loan.  Such authorization would also

be consistent with the relationship between Joseph and his nephew Solomon.  The picture that

emerged from the trial testimony was that, despite the sizable amounts of money involved, Joseph

was quite casual about the loan transactions he entered into with his nephew.  As Joseph describes

the relationship: "[Solomon] was supposed to go and find real estate properties and negotiate those

terms." *Trial Transcript (Oct. 27, 2009)* 62:2-3.  Joseph was content to put all of his faith in Solomon

when it came to real estate transactions.  As he explained: "[Solomon] was like the hero, my hero.

He knew all the real estate.  I didn't know anything about real estate.  I was in the garment business."

---

[1]Joseph testified that he had not specifically authorized Solomon to do that.  *Trial Transcript (Jan. 26, 2010)* 19:2-5.
But for the purposes of this analysis it is significant that at no point has Joseph sought to repudiate the Goodyear
Windsor loan on the basis of an unauthorized signature. *Trial Transcript (Jan. 26, 2010)* 17:3-6.

*Trial Transcript (Oct. 27, 2009)* 66:18-20.  Accordingly, the Court finds that Solomon was authorized

to execute the remainder of the loan documents on Joseph's behalf.

B.  Ratification

The Bank argues that even if Joseph did not sign the mortgage or did not authorize Solomon

to sign on his behalf, the Dweks are still obligated on the mortgage and note because Joseph ratified

Solomon's action by failing to repudiate the transaction timely.  The Dweks counters that because

the defense of ratification is an equitable defense it should not be available to a party with unclean

hands such as the Bank.

The New Jersey Supreme Court has explained that the application of the doctrine of unclean

hands "is discretionary on the part of the court."  Marino v. Marino, 200 N.J. 315 (2009) (J. Rivera-

Soto dissenting) (quoting Borough of Princeton v. Bd. of Chosen Freeholders of Mercer County, 169

N.J. 135 (2001)).  New Jersey courts have recognized that the equitable maxim that a party who

comes into equity must do so with clean hands has its limitations.  Heuer v. Heuer, 152 N.J. 226

(1998).  As explained long ago, "It is the effect of the inequitable conduct on the total transaction

which is determinative whether the maxim shall or shall not be applied."  Untermann v. Untermann,

19 N.J. 507, 518 (1955).

The Dweks also argue that "until the 25th hour" the Bank was in the best position to prevent

the fraud perpetrated by Solomon.  In support, they note that New Jersey courts have long held that

where there are multiple innocent parties, it is the party who could have prevented the loss first that

must bear the burden of the loss.  Zucker v. Silverstein, 134 N.J. Super. 39, 52 (App. Div. 1975) ("as

between two innocent groups equity will impose the loss on the group whose act first could have

prevented the loss.").  The Court finds that equitable maxim to be inapplicable here.  The task of the

Court in this case is not to allocate loss among innocent parties; it is to allocate loss among parties

of varying degrees of culpability.  Therefore, there is no equitable bar to stop the Bank from raising

ratification as a defense in this case.

New Jersey law defines ratification as "the affirmance by a person of a prior act which did

not bind him but which was done, or professedly done on his account, whereby the act, as to some

or all persons, is given effect as if originally authorized by him."  Martin Glennon, Inc. v. First

Fidelity Bank, N.A., 279 N.J. Super. 48, 60 (App. Div. 1995).  The prerequisites to finding

ratification are intent to ratify coupled with full knowledge of all material facts.  Id.  The Court finds

that both prerequisites are satisfied here.

It is well settled that the "intent to ratify an unauthorized transaction may be inferred from

a failure to repudiate it."  Citizens First Nat. Bank of New Jersey v. Bluh, 281 N.J. Super. 86, 98

(App. Div. 1995) (quoting Johnson v. Hospital Serv. Plan of N.J., 25 N.J. 134, 141 (1957)).  If the

failure to repudiate is the result of silence or inaction, then it must be "shown that the principal did

nothing or said nothing after he was fully informed of what his agent had done."  Id.  The New Jersey

Supreme Court long ago noted:

> The rule is settled that where the silence of a principal may cause loss to a third
> person, or give him an advantage, he must, without unreasonable delay after the fact
> comes to his knowledge that his agent has exceeded his authority, disown his agent's
> act and afford the other party an opportunity to protect himself, or he will make his
> agent's act his own.

Chetwood v. Berrian, 39 N.J. Eq. 203, 209 (Ch. 1884), *aff'd*, 39 N.J. Eq. 517 (E&A 1885) (cited in

Citizens First Nat. Bank of New Jersey v. Bluh, 281 N.J. Super. 86, 98 (App. Div. 1995)).  Here, the

Dweks did not disown Solomon's act until their attorney sent a letter to the Bank dated June 9, 2006

[Ex. D 22].  The law requires a person to repudiate an unauthorized act "without unreasonable delay

9

after the fact comes to his knowledge that his agent has exceeded his authority." <u>Chetwood</u> at 209.

Even if the Court had not found that Joseph signed the mortgage, it is undisputed that Joseph became

aware of the loan and the mortgage on his home no later than March, 2005. It is also undisputed that

shortly thereafter Joseph contacted the Bank to inquire about the loan. At that time he spoke with

Cheryle Hale, a customer service representative. Joseph would have the Court believe that in that

telephone conversation he was "clear and unambiguous" when he stated that the loan was not his.

Moreover, the Plaintiffs attempt to discredit the testimony of Cheryl Hale to the contrary because her

"memory was clouded at best." *Plaintiffs Proposed Findings of Fact and Conclusions of Law* at 32.

The Court found the testimony of Cheryl Hale to be absolutely clear and consistent. She was asked

four separate times between direct and cross-examination if she remembered Joseph Dwek

repudiating the loan and she said that he did not. It is simply implausible that a bank employee, who

had nothing to hide because she had no involvement in the initiation of the loan, would be told by a

customer that he denies that a loan is his and that the employee would do nothing with that

information. Far more credible is Ms. Hale's testimony:

> Q: And if Mr. Dwek would have told you that loan was made in error or there was some type of malfeasance or that he was specifically repudiating the loan, is there anything, what, if anything, would you have done?
>
> A: I would have brought it to the attention of my boss and also the credit officer that was on site.
>
> Q: And did you ever do that in relations to this loan?
>
> A: No. Never done that ever. Never had this come up before.
>
> Q: And if you had done that would that have been something that you would remember?
>
> A: Absolutely.

*Trial Transcript (Jan 26, 2010)* 7:2-15.  It does not undercut Ms. Hales's testimony that there were

certain details of her communications with Joseph Dwek that she did not remember because it

occurred over five years ago.  It would not be uncommon for a person to remember an unusual event -

such as an accusation of forgery -  and at the same time not remember a commonplace detail - such

as whether a document was faxed.  Additionally, Joseph Dwek's claim that he clearly told the Bank

that the loan was not his in March 2005 does not comport with the letter his attorney sent in June

2006 repudiating the loan.  That letter makes no reference to a prior attempt by the Dweks to

repudiate the loan.  The absence of any reference to the alleged repudiation in March 2005 is far more

suggestive of the actual state of affairs than Joseph Dwek's current attempt to shape the facts. Also

significant is the fact that after Joseph became aware of what he considered Solomon's unauthorized

placement of a mortgage on his property he continued to do business with him.  In fact, he gave

Solomon another $50 million dollars to invest in real estate. *Trial Transcript (Oct. 27, 2009)* 98:10-

14.  That action is not consistent with a claim that Joseph repudiated the $1.5 million loan.  *See*,

Johnson v. Hospital Serv. Plan of N.J., 25 N.J. 134, 141 (1957) (condoning the agent's acts and

continuing a relationship with him constituted ratification of the fraudulent acts).

It became readily apparent at trial that whether or not Joseph had authorized Solomon to

obtain this loan, once the existence of the loan came to his attention he decided to keep the matter

"in the family".   That can clearly be discerned from the following testimony of Joseph Dwek on

direct:

Q:  What was your relationship like with Mr. Solomon Dwek back in March 2005?

A:  We were very close. We were doing different business transactions. Little did I
know that the business transactions that I was doing are going to turn out to be all
fraudulent in nature which I can go into detail later but until that time everything was
smooth and fruity and everything is doing fine and everything is doing great and so

this was a big shock to me that he could take out a mortgage on my house and being
he's my nephew and he said he was going to discharge it I trusted him.

Q: Did you consider bringing a lawsuit against Solomon Dwek at that time?

A:  I did not consider a lawsuit because he promised he's going to take care of it and
until that time he kept his word so I thought for sure I'm going to discharge it and he
said, don't worry, I'll take care of it, and a few months later the e-mails, I tell him,
where is the discharge? He said, no, Joey, you don't understand, it takes sometimes
six to eight months to get a discharge officially on the books. Don't worry, it's going
to be off. I took care of it. You don't have to ask me about it anymore.

*Trial Transcript (Oct. 27, 2009)* 67:2-23.  Allowing Solomon to pay off and discharge the loan is

inconsistent with Joseph's claim that he had repudiated the loan in his conversation with Ms. Hale.

If Joseph had repudiated the loan, then he should have been calling the Bank and demanding to know

why the mortgage had not been discharged, not Solomon.  Joseph's dealings with Solomon after

March 2005 are inconsistent with the rule of law that "where the silence of a principal may cause loss

to a third person, or give him an advantage, he must, without unreasonable delay after the fact comes

to his knowledge that his agent has exceeded his authority, disown his agent's act and afford the other

party an opportunity to protect himself, or he will make his agent's act his own."  Chetwood v.

Berrian, 39 N.J. Eq. 203, 209 (Ch. 1884), *aff'd*, 39 N.J. Eq. 517 (E&A 1885) (cited in Citizens First

Nat. Bank of New Jersey v. Bluh, 281 N.J. Super. 86, 98 (App. Div. 1995)).  Joseph made the

decision to delay disavowing the actions of Solomon, and as a result deprived the Bank of the

opportunity to try to take actions to minimize its exposure; as a result, he made Solomon's actions

his own.

The second element needed for ratification is that the person had full knowledge of all

material facts. Martin Glennon, Inc. v. First Fidelity Bank, N.A., 279 N.J. Super. 48, 60 (App. Div.

1995).  That element is also satisfied.  When distilled to its essence, the only material fact pertinent

12

to this analysis is that in March 2005 Joseph Dwek became aware that a mortgage had been placed

on his property to secure a $1.5 million loan.  If the Dweks did not authorize that mortgage they could

have  repudiated the mortgage in some official manner, such as the letter their attorney sent in June

2006, but they did not.  Aside from a phone call inquiring about the loan in March 2005, Joseph did

nothing to alert the Bank that he was denying responsibility for that loan.

The Dweks argue that Joseph and Terry could not have had full knowledge of the material

facts because Solomon admitted lying to Joseph about the mortgage being discharged.  That argument

misidentifies the moment of choice: in March 2005 when Joseph failed to take firm and definitive

action to repudiate the loan, he was ratifying Solomon's actions.  Solomon's misrepresentations about

the loan being discharged all occurred subsequent to the moment of choice.  The law does not allow

a party to act at its leisure, the law requires a person to repudiate an unauthorized act "without

unreasonable delay after the fact comes to his knowledge that his agent has exceeded his authority."

Chetwood at 209.  That fact that there was a mortgage on the property and Solomon exceeded his

authority came to Joseph's attention in March 2005.  The back and forth between Solomon and

Joseph regarding allowing Solomon an opportunity to make amends for his unauthorized act is

irrelevant to the analysis from the Bank's perspective.

The Dweks' contention that Joseph was justified in taking no further action because he clearly

informed the Bank that the loan was not his simply does not fit with the other facts in the record.  If

Joseph believed that he had done all that was necessary to insulate himself from liability on the loan

then his phone calls and e-mails to Solomon over the course of months demanding that Solomon

discharge the mortgage make no sense.  *Trial Transcript (Oct. 27, 2009)* 68:13-23.  Also, since

Joseph has demonstrated that he knew he could pick up the phone and call to question a loan that

appeared on his credit report, it is simply not credible that he did not think he could pick up the phone

and confirm with the Bank that it was in the process of discharging the mortgage.  Rather, it is clear

from the communications between Joseph and Solomon that while Joseph's financial dealings with

Solomon were still profitable, Joseph was content to allow the loan issue to remain between him and

Solomon and not to involve the Bank further or to contact the police or file a civil complaint.  When

Joseph was asked in his deposition why he did not take additional action beyond the phone calls and

e-mails to Solomon to protect his interest he responded "you got to look at the whole picture ... In

the meantime, he's making investment, we're getting paid ... So okay, you have patience."  *Joseph

Dwek deposition transcript (September 4, 2008)* 67-68.  Joseph is free to choose to allow his nephew

time to pay off the mortgage on his property, but when that does not pan out he may not then turn to

the Bank and say "not my loan".  Based on Joseph's actions, the Court finds that Joseph ratified the

loan transaction.

Finally, the Court finds that under the circumstances it is appropriate to extend Joseph's

ratification to his wife Terry.  Terry allowed her husband to act as her agent in financial matters. For

example, Joseph signed Terry's name to an $18 million mortgage on the Runyon property to HSBC

Bank in September 2005 [Ex. D12;  *Trial Transcript (Oct. 27, 2009)* 32:5-15]  Given the broad

authority Terry granted to her husband to act on her behalf in financial matters, she  may not single

out this transaction and claim that it was unauthorized.  The Court finds that the Joseph and Terry

Dwek ratified the loan and are therefore obligated under it.

C.  Causes of action pled

In ruling on the motion and cross-motion for summary judgment in this case, the Court chided

the parties for failing to address themselves to the actual counts of the complaint and the

counterclaim.  Despite that admonition, the parties filed closing statements and proposed findings of

law and fact that suffer from the same problem.  Therefore, the Court is forced to attempt to reconcile

the evidence presented at trial with the causes of action pled.

The Dweks' Complaint has three counts: First Count (declaratory judgment as to the Bank),

Second Count (negligence as to the Bank), and Third Count (fraud as to Solomon Dwek).  The Bank

filed an answer that contained a counterclaim, cross-claim, and third-party complaint.  The

Counterclaim has eleven counts: First Count (breach of contract as to Joseph and Terry), Second

Count (account stated as to Joseph and Terry), Third Count (unjust enrichment as to Joseph and

Terry), Fourth Count (fraud as to Solomon), Fifth Count (unjust enrichment as to Solomon), Sixth

Count (equitable mortgage as to Joseph, Terry and Solomon), Seventh Count (fraudulent transfer as

to Joseph, Terry and Solomon), Eighth Count (fraud as to Amy Annecharico), Ninth Count

(declaratory judgment as to Joseph, Terry and Solomon), Tenth Count (indemnification as to

Solomon), and Eleventh Count (contribution as to Solomon).  Additionally, the Bank consolidated

its non-dischargeability adversary complaint against Solomon with this action.  That complaint is

rendered moot by the Court's finding in favor of the Bank.  The Court presumes that the Bank has

abandoned its third-party complaint against Amy Annecharico.

The First Count of the Dwek's complaint seeks a declaratory judgment that the loan is void.

Based on the Court's findings, that Count can be dismissed.  The Second Count alleges negligence

on the part of the Bank.  As the plaintiffs, it was the Dweks' burden to establish the elements of that

cause of action.  They have failed to do so.  To prevail on a claim of negligence a plaintiff must prove

"(1) the existence of a duty; (2) the breach of that duty; and (3) proximate causation of damages."

LaBracio Family Partnership v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155 (App. Div. 2001).

The Dweks did not establish the first or third elements. The Dweks failed to present sufficient evidence to demonstrate what the reasonable standard of care in the banking industry was with regard to commercial loans. The testimony of Frank Leis was insufficient for that purpose because he was not qualified as an expert in commercial lending. Even if the Court were to find that the failure to abide by N.J.S.A. 46:2B-8.9 (requiring a valid power of attorney for an agent) was sufficient to establish negligence, the Dweks still did not show that the Bank's negligence was the proximate cause of their damages: the cause of the Dweks' damages was their failure to repudiate the loan when they became aware of it. The Third Count for fraud against Solomon Dwek is negated by the Dweks' ratification of the loan.

The Bank's counterclaim in the Ninth Count seeks a declaratory judgment that "[t]o the extent that the Court determines that the signatures of Joseph and Terry were affixed to the Loan Documents by Solomon, then Solomon acted with actual or apparent authority on the part of Joseph and Terry in signing the Loan Documents on their behalf." *Counterclaim* at ¶ 47. Based on the Court's foregoing findings it will grant judgment in Sun's favor on the Ninth Count of its Counterclaim.

The First Count of Sun's counterclaim alleges breach of contract for the failure of Joseph and Terry Dwek to make payment on the loan. The evidence at trial establishes that no payments were made on the loan after Solomon ceased making payments in May 2006. Because the Court finds that the Dweks are obligated under the loan by virtue of their ratification, the Court can find in Sun's favor on the First Count.

The remaining Counts in Sun's counterclaim appear to either seek duplicative relief or to be rendered moot and may be dismissed.

16

<u>Conclusion</u>

Judgment is rendered in the Bank's favor on the First and Ninth Counts of its counterclaim.

As of December 15, 2009, the total amount of Sun's damages is found to be $1,845,850.85.   The

Dweks' complaint will be dismissed, as well as the remainder of the counts in Sun's counterclaim,

cross-claim, third-party complaint, and its non-dischargeability complaint.  This case [07-1616] and

the consolidated adversary proceeding [07-1697] will be closed when the appeal period has run.

Counsel for Sun shall submit a form of order consistent with this opinion.


*/s/ Kathryn C. Ferguson*
KATHRYN C. FERGUSON
US Bankruptcy Judge

Dated: June 1, 2010